IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

SHAWNA HESS                                                                                          PLAINTIFF

v.      CASE NO.:  5:11CV249JMM

CAROL ABLES, Individually, and in her
Official Capacity as an employee of the City of Stuttgart;
TOMMY LAWSON, Individually, and in his Official Capacity
as an employee of the City of Stuttgart, MARION MAYNARD,
Individually, and in her Official Capacity as Mayor of the City
of Stuttgart, and THE CITY OF STUTTGART                          DEFENDANTS

## PLAINTIFF'S BRIEF IN SUPPORT OF RESPONSE TO
## MOTION FOR SUMMARY JUDGMENT

Comes Plaintiff, by and through counsel, Sutter & Gillham, PLLC, and for his Brief, states:

### INTRODUCTION

If one views the facts in the light most favorable to the Plaintiff, there are shifting reasons inconsistent with any honest belief.  A party moving for summary judgment bears the exacting burden of proving that there are no genuine issues of material fact entitling the party to a judgment as a matter of law.  F.R.C.P. 56.  As the Supreme Court stated in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), summary judgment is inappropriate unless the evidence is so one-sided that a reasonable jury could arrive at only one conclusion.  *Id.* at 251-252.  "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge."  *Id.* at 255.  Summary judgment review mirrors that of judgment as a matter of law. *Id.* at 251. In deciding whether to grant judgment as a matter of law, a "court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, *at least to the extent that [the movant's uncontradicted] evidence comes from disinterested witnesses*."  *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 151 (2000) (emphasis added); *Bazan v. Hidalgo County*, 246 F.3d 481, 492 (5th Cir. 2001).  Based on this standard, it is clear that the Defendant has failed to carry the burden of proving entitlement to judgment as a matter of law on Plaintiff's claims.

Based on some Defendants' Brief and Statement of Facts, it is clear that Defendant has attempted to draw all inferences in the their favor and disregard all counter-veiling testimony and evidence. However, the facts when seen in the proper light clearly illustrate why Defendants' Motion is due

to be denied. There is no requirement that Plaintiff prove the constitutional violation was the determining factor. In order to state a prima facie claim under 42 U.S.C. § 1983, 3 the plaintiffs must allege that the defendants, acting under color of state law, caused a constitutional violation. Lesher v. Reed, 12 F.3d 148 (8th Cir. Ark. 1994) citing Alexander v. Peffer, 993 F.2d 1348, 1349 (8th Cir. 1993). Public employees, like private citizens, are entitled to the benefits of the Constitution, and the state may not coerce them into relinquishing a constitutional guarantee under threat of losing their employment. Id. Thus, the constitutional injury happened when, according to Abels, the failure to take the test caused the termination.

### I. GENERAL SECTION 1983 LAW AND LIABILITY OF MAYNARD

In general, "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents" on a respondeat superior theory of liability. Monnell v. New York Dep't of Soc. Servs., 436 U.S. 658, 694, 98 S.Ct. 2018 (1978). Under *Monell,* the City can be liable under § 1983 for the nurses' allegedly unlawful actions if Crift can show that the City caused those unlawful acts. *Id.* Specifically, Crift can show either that "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," or that the alleged unconstitutional action was "visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.* at 690-91. Also, a local government may also be subject to § 1983 liability for "inadequate training of its employees," City of Canton v. Harris, 489 U.S. 378, 388, 109 S.Ct. 1197 (1989), "where (1) the [county's] ... training practices [were] inadequate; (2) the [county] was deliberately indifferent to the rights of others in adopting them, such that the 'failure to train reflects a deliberate or conscious choice by [the county]'; and (3) an alleged deficiency in the ... training procedures actually caused the plaintiff's injury." Andrews v. Fowler, 98 F.3d 1069, 1076 (8th Cir. 1996) (quoting City of Canton, 489 U.S. at 389, 109 S.Ct. 1197). Finally, a decision by municipal policymakers on a single occasion may result in municipal liability under 42 U.S.C. § 1983 for actions it officially sanctioned or ordered. Williams v. Butler, 863 F.2d 1398, 1401 (8th Cir. 1988). A ratification can be a basis for liability as well. See Pembaur v. City of Cincinnati, 475 U.S. 469, 480-84, 106 S.Ct.

1292 (1986); Williams, 863 F.2d at 1401. The Mayor of Stuttgart was informed of the decision to terminate the Plaintiff and ratified the decision. Ex D at Pp.4-5. Persons who stand by and allow constitutional violations are liable in similar contexts. Under this theory, an officer that fails to take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under § 1983. *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995); see also Anderson v. Branen, 17 F.3d 552, 556 (2d Cir. 1994); *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). To prevail on a failure to protect claim, under a bystander liability theory, a plaintiff must prove that the bystanding officer had a "reasonable opportunity to realize the excessive nature of the force and a reasonable opportunity to intervene and stop it." *Nowell v. Acadian Ambulance Service*, 147 F.Supp.2d 495, 507 (W.D. La. 2001). Here, the Mayor had the ability to reverse the decision, yet did nothing.

### 1. UNCONSTITUTIONAL POLICY OR CUSTOM

Plaintiff need not show deliberate indifference under a direct *Monell* approach. S*ee Board of the County Commissioners of Bryan County v. Brown*, 520 U.S. 397, 411, 117 S.Ct. 1382 (1997). Monell was a case where the city's policy was itself unconstitutional. The policy compelled a constitutional violation by requiring pregnant female employees to take unpaid leaves of absence before their absences from work were medically necessary. *See Cleveland Bd. of Educ. v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791 (1974). The potential for municipal liability in that situation is well established, because a constitutional violation flows directly from a policymaker's deliberate choice reflected in an official policy or action. *E.g.,* Pembaur v. City of Cincinnati, 475 U.S. 469, 481, 484-85, 106 S.Ct. 1292 (1986); City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 251-52, 101 S.Ct. 2748 (1981); Owen v. City of Independence, 445 U.S. 622, 627-29, 633 & n. 13, 100 S.Ct. 1398 (1980). "Where a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so, resolving [the] issues of fault and causation is straightforward." Bd. of the County Comm'rs v. Brown, 520 U.S. 397, 404-05, 117 S.Ct. 1382 (1997). To establish a constitutional violation, no evidence is needed other than a statement of the municipal policy and its exercise. City of Oklahoma City v. Tuttle, 471 U.S. 808, 822-23, 105 S.Ct. 2427 (1985) (plurality opinion). Such is the case here. The policy decision, ratified by the Mayor,

to require employees to undergo 4th Amendment searches violates the constitution.

Although the Plaintiff notes the Defendants have requested qualified immunity, the clearly established law is to the contrary. A Urine Drug Test is a search. A Urine Drug Screen performed without consent is illegal. *Ferguson v. City Of Charleston*, 532 U.S. 67 (2001). This is a violation of the 4th and 14th Amendments. Further, oral statements by a supervisor reassuring employees that they would not be fired immediately for failing a drug test give rise to a Due Process claim as well. *Qualls v.Hickory Springs Manufacturing Company, Inc.*, 994 F.2d 505, 506, 509 (8th Cir. 1993). This is an unconstitutional policy or custom.

This policy of cooperation by Lawson and Abels with the State Police ultimately lead to Plaintiff's termination. As is the case here, in *Ferguson*, state City obstetrics patients who were arrested after testing positive for cocaine, in urine tests conducted by the Hospital pursuant to policy developed in conjunction with police, sued the Hospital, state solicitor, city, state police, and individual medical personnel, alleging, inter alia, violation of Fourth Amendment. The United States Supreme Court held, (1) urine tests were "searches" within meaning of Fourth Amendment, and (2) tests, and reporting of positive test results to police, were unreasonable searches absent patients' consent, in view of policy's law enforcement purpose. Yet this is precisely what happened here. The Trooper requested the UDS for his own purposes, and the City never requested a Drug Screen. Thus, this was not a drug screen requested under City policy, but a 4th Amendment Search.

As in *Lesher,* The reason search occurred, however, "is wholly irrelevant to the threshold question of whether the [Fourth] Amendment applies"; what matters "is the intrusion on the people's security from governmental interference." Lesher v. Reed, 12 F.3d 148, 150 (8th Cir. 1994) (quoting Soldal v. Cook County, Ill., 506 U.S. 56, 69, 113 S. Ct. 538, 121 L. Ed. 2d 450 (1992)); DePugh v. Penning, 888 F. Supp. 959, 983 (N.D. Iowa 1995) (same). Plaintiff's status as a public employee is not dispositive. See Lesher, 12 F.3d at 150 (stating the defendants "mistakenly" focused on the fact that the plaintiff was a public employee, when defendants argued no seizure occurred). A "public employee's rights with respect to searches or seizure in his home are no different than a private citizen's." Id. at 151 (holding public employer's seizure of dog in

employee's home was subject to Fourth Amendment scrutiny) (citing O'Connor v. Ortega, 480 U.S. 709, 715, 107 S. Ct. 1492, 94 L. Ed. 2d 714 (1987)). A search or seizure carried out in an individual's home without a warrant, even when conducted by a public employer, is per se unreasonable under the Fourth Amendment, unless it falls within one of the well-defined exceptions. Id. (citing Coolidge v. New Hampshire, 403 U.S. 443, 474, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971)); see Groh, 540 U.S. at 564 (citing Payton v. New York, 445 U.S. 573, 586-88, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980)).  Likewise, a search of one's person deserves the same protection.

There is no doubt the Trooper's drug-testing requirement, imposed by law and enforced by state officials, effects a search within the meaning of the Fourth and Fourteenth Amendments. See Skinner, 489 U.S. at 617.  As explained in Skinner, government-ordered "collection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable." 489 U.S. at 617. To be reasonable under the Fourth Amendment, a search ordinarily must be based on individualized suspicion of wrongdoing. See Vernonia, 515 U.S. at 664--667.  Here, there was none.  Plaintiff refused to take the drug test because the city did not request that she take the drug test.  (Ex. F, Hess Dep. at 22:25-23:1-5 and 38:5-13)  Hess would have allowed Chastain to give her a drug test but Mr. Lawson told her he would "honor" her own drug test.  (Id. at 22:2-20)

Hess finally told Mr. Chastain that she would flunk the test so that she be allowed to leave. (Id. at 20:7-20)  State Police Officer David Chastain requested that Hess drive a city vehicle after he spoke with her at the Wal-Mart parking lot and Hess's supervisor Tommy Lawson did not believe that Hess was under the influence or using drugs.  (Ex.C, Lawson Dep. at 11:11-22)  In fact, Hess was not under the influence or in possession of drugs that day of her termination.  (Ex. F, Hearing at 40:4-42:22)   In fact, she had her own drug test performed which showed that she was clean.  (Ex. F, Hess Drug Screen)  She immediately provided the test to Mr. Lawson.  (Ex.C, Lawson Dep. at 19:7-22)    Finally, the fact that the officer's unconstitutional request occurred during work hours does not vitiate her constitutional right. See Lesher, 12 F.3d at 150 (stating that plaintiffs' constitutional right against unreasonable seizures from their home was not vitiated merely because the employer believed the dog seized from plaintiffs belonged to employer).

Thus, summary judgment should be denied, since Defendants cannot demonstrate its knowing act of punishing the Plaintiff for refusing to allow the Trooper to acquire evidence without consent for evidentiary purposes pursuant to law enforcement is constitutional. *Pietrafeso v. Lawrence County*, 452 F.3d 978, 982 (8th Cir. 2006) ("A county is liable if an action or policy itself violated federal law, or if the action or policy was lawful on its face but led an employee to violate a plaintiff's rights [and] was taken with 'deliberate indifference' as to its known or obvious consequences.") (internal quotation omitted); Audio *Odyssey, Ltd. v. Brenton First Nat'l Bank*, 245 F.3d 721, 742 (8th Cir. 2001) ( "[T]he 'policy' of using 'Directions to the Sheriff' forms is not itself unconstitutional, as an express policy or affirmative custom must be to create municipal liability"), *judgment vacated & opinion reinstated in relevant part by* 286 F.3d 498 (8th Cir. 2002) (en banc). Here, the evidence shows an unconstitutional policy or custom.

## II.   RATIFICATION

Courts have recognized that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984). Here, the City made no policy changes, after this episode, given little to no discipline to the nurses, and refuse to even admit that what their Nurses did was wrong even in Crift. (Depo. of Heard pp. 44-49). Lackluster disciplinary responses are relevant in a *Monell* case and can cause constitutional injuries. First, municipal policymakers who fail to supervise and to discipline their police officers, acting with deliberate indifference to the citizens' rights, could create municipal liability if the lack of supervision then caused a deprivation of constitutional protections. *Cf.* 520 U.S. at 406-10, 117 S.Ct. 1382 (discussing liability for inadequate training and hiring policies). Second, even though a policymaker's response to a particular incident may not cause the injury, the response might provide evidence of the content of a municipality's policies. That is, the failure to take disciplinary action in response to an illegal search, when combined with other evidence, could tend to support an inference that there was a preexisting, *de facto* policy of making illegal search: the policymaker did not discipline the employee because, in the policymakers' eyes, the employee's illegal conduct

actually conformed with municipal policy. *See Bordanaro v. McLeod*, 871 F.2d 1151, 1166-67 (1st Cir. 1989); *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985). C*f. City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915 (1988) ("Refusals to carry out stated policies could obviously help to show that a municipality's actual policies were different from the ones that had been announced."). *Praprotnik* acknowledges that "[i]f the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." Id. at 127, 108 S.Ct. 915. Here, the Lawson and Able's actions are sufficiently extreme, an obvious violation of clearly established law under *Ferguson*, so a policymaker's ratification or defense of his subordinate's actions is sufficient to establish an official policy or custom. Ex D at 4-5.

### III. SUBSTANTIVE DUE PROCESS

It is ironic that the very case that recognized one of the wrongs alleged in this case also recognized complaints under a substantive due process theory.  The Due Process Clause of the Fifth Amendment states that "no person shall ... be deprived of life, liberty, or property, without due process of law...." Substantive due process prevents the government from engaging in conduct that "shocks the conscience," *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209 (1952), or interferes with rights "implicit in the concept of ordered liberty." *Palko v. Connecticut*, 302 U.S. 319, 325-326, 58 S.Ct. 149 (1937).   To resolve the question of whether the Defendants' conduct violated his constitutional right to due process, this Court must look at the totality of the circumstances and considers: (1) whether the Due Process Clause prohibits the alleged deprivation of rights; (2) whether the defendants' conduct offends the standards of substantive due process; and (3) whether the totality of the circumstances shocks the court's conscious. *See Luckes v. County of Hennepin, MN*, 415 F.3d 936, 939 (8th Cir. 2005); *Hayes v. Faulkner County, AR*, 388 F.3d 669, 675 (8th Cir. 2004).  Obviously, Plaintiff has, and had, a right to be free from unreasonable searches, privacy, and bodily integrity.  Judge Volpe has found that when defendants have no policy or procedure in effect to avoid violating both state law and the United States Constitution, and a verbal policy proven ineffective, such conduct shocks the conscious. *Curtis v. White*, 2010 WL 5625668 (E.D. Ark. 2010).

**IV.    SECTION 504**

Defendants fail to cite a single case that applies the ADAA, which amends Section 504. First, the City contends that it is not a recipient of federal financial aid, but it is. See Ex G. Section 504 applies to entities, and Exhibit G demonstrate the federal funds are held in the general fund. Thus, Section 504 applies to the City Stuttgart. Indeed, Defendants do not appear to address the Plaintiff's claim that she was "regarded as" an illegal drug user in any detail. The Motion should be denied as well, since Plaintiff objects to new arguments in Reply.

Plaintiff's refusal to take the drug test was the sole reason articulated by the City in the unemployment hearing. But the reasons shift. This shift gives rise to Plaintiff's Section 504 claim. Based upon the Trooper's report of her alleged drug use, Plaintiff was regarded as person with a disability under Section 504 for her alleged drug use, and actually disabled under Section 504 and the ACRA for her insomnia. Persons who formerly have used illegal drug users may be a disability under the ADA. Honestly believing Plaintiff was a drug user is no defense. A reasonable jury could find that Plaintiff's alleged drug use was the sole reason. In fact, it is the very conduct Section 504 prohibits. The Motion should be denied, since Section 504 protects persons who have used illegal drugs.. *Wright v. Sherwood Urgent Care*, 4:11-cv-00529-JMM (DE 16 12/1/11). Under former law, "To be regarded as being disabled under the ADA, Plaintiff would have to show that Defendant mistakenly believed that she had a physical impairment that substantially limited one or more major life activities. Sutton v. United Air Lines, Inc., 527 U.S. 471, 489 (1999)." The ADAAA explicitly rejected Sutton.

According to the EEOC, to satisfy the "regarded as" standard an individual need only show that he or she has been subjected to an action prohibited under the statute (e.g., termination; failure to hire) because of an actual or perceived impairment. Like 504, the ADA prohibits employment discrimination by a "covered entity . . . against a qualified individual on the basis of disability in regard to . . . discharge of employees, . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Under the ADA, a person is disabled if he has: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) [is] regarded as having such an impairment."

See 42 U.S.C. § 12102(1). On January 4, 2008, Congress modified "the standard by which courts assess whether a person has a disability under the ADA." See *Villanti v. Cold Spring Harbor Central School District*, 733 F. Supp. 2d 371, 377 (E.D.N.Y. 2010). The ADA Amendments (the "ADAA') broaden the definition of disability, stating that the definition is to "be construed in favor of broad coverage of individuals . . . to the maximum extent permitted by the terms of [the] Act." 42 U.S.C. § 12102(4).

The ADA does not define the term "physical impairment." However, the EEOC regulations implementing the ADA do provide guidance concerning the interpretation of the statute. See *Negron v. City of New York*, 2011 U.S. Dist. LEXIS 119463 *32 (E.D.N.Y. Sept. 14, 2011). The EEOC regulations define physical impairment, in pertinent part, as:

[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine.

29 C.F.R. § 1630.2(h)(1).  Even under prior law, insomnia was a disability. *Felix v. New York City Transit Authority*, No. 01-7967, 2003 WL 1661135 (2d Cir. Mar. 31, 2003).  Congress undoubtedly intended to broaden the scope of the ADA by enacting the ADAAA  *Brandon v. O'Mara*, 2011 U.S. Dist LEXIS 112314 * 19 (S.D.N.Y. Sept. 28, 2011). The ADAAA redefined and dramatically expanded the scope of coverage under the "regarded as" prong of the definition of "disability." http://www.dol.gov/ofccp/regs/compliance/faqs/ADAfaqs.htm.

According to the EEOC, coverage under the "regarded as" prong of the definition of disability should not be difficult to establish. See 2008 House Judiciary Committee Report at 17 (explaining that Congress never expected or intended it would be a difficult standard to meet). Under the third prong of the definition of disability, an individual is "regarded as having such an impairment" if the individual is subjected to an action prohibited by the ADA because of an actual or perceived impairment that is not "transitory and minor."

This third prong of the definition of disability was originally intended to express Congress's understanding that "unfounded concerns, mistaken beliefs, fears, myths, or prejudice about

disabilities are often just as disabling as actual impairments, and [its] corresponding desire to prohibit discrimination founded on such perceptions." 2008 Senate Statement of Managers at 9; 2008 House Judiciary Committee Report at 17 (same).  This is why honest belief has no place in this case.

Accordingly, the ADA Amendments Act broadened the application of the "regarded as" prong of the definition of disability. 2008 Senate Statement of Managers at 9-10. In doing so, Congress rejected court decisions that had required an individual to establish that a covered entity perceived him or her to have an impairment that substantially limited a major life activity. This provision is designed to restore Congress's intent to allow individuals to establish coverage under the "regarded as" prong by showing that they were treated adversely because of an impairment, without having to establish the covered entity's beliefs concerning the severity of the impairment. Joint Hoyer-Sensenbrenner Statement at 3.

Thus it is not necessary, as it was prior to the ADA Amendments Act, for an individual to demonstrate that a covered entity perceived him as substantially limited in the ability to perform a major life activity in order for the individual to establish that he or she is covered under the "regarded as" prong. Nor is it necessary to demonstrate that the impairment relied on by a covered entity is (in the case of an actual impairment) or would be (in the case of a perceived impairment) substantially limiting for an individual to be "regarded as having such an impairment." In short, to qualify for coverage under the "regarded as" prong, an individual is not subject to any functional test. See 2008 Senate Statement of Managers at 13 ("The functional limitation imposed by an impairment is irrelevant to the third `regarded as' prong."); 2008 House Judiciary Committee Report at 17 (that is, "the individual is not required to show that the perceived impairment limits performance of a major life activity"). Defendant may argue it is unclear what major life activity she contends it regarded her as being unable to do."  Such is not required.  According to the EEOC, the concepts of "major life activities" and "substantial limitation" simply are not relevant in evaluating whether an individual is "regarded as having such an impairment."

To illustrate how straightforward application of the "regarded as" prong is, if an employer refused to hire an applicant because of skin graft scars, the employer has regarded the applicant

as an individual with a disability. Similarly, if an employer terminates an employee because he has cancer, the employer has regarded the employee as an individual with a disability.

A "prohibited action" under the "regarded as" prong refers to an action of the type that would be unlawful under the ADA (but for any defenses to liability). Such prohibited actions include, but are not limited to, refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment. Where an employer bases a prohibited employment action on an actual or perceived impairment that is not "transitory and minor," the employer regards the individual as disabled, whether or not myths, fears, or stereotypes about disability motivated the employer's decision. https://www.federalregister.gov/articles/2011/03/25/2011-6056/regulations-to-implement-the-equal-employment-provisions-of-the-americans-with-disabilities-act-a. But Plaintiff also has a disability, insomnia, even under prior law. *Felix v. New York City Transit Authority*, No. 01-7967, 2003 WL 1661135 (2d Cir. Mar. 31, 2003). The ACRA should be interpreted consistently with the ADA.

Under state law, a person cannot be discharged for a drug test under A.C.A. § 11-14-107. All specimen collection and testing for drugs and alcohol under this chapter shall be performed in accordance with the procedures provided for by the United States Department of Transportation rules for workplace drug and alcohol testing compiled at 49 C.F.R., Part 40. *Id.* A covered employer may not discharge, discipline, refuse to hire, discriminate against, or request or require rehabilitation of an employee or job applicant on the sole basis of a positive test result that has not been verified by a confirmation test and by a medical review officer. *Id* A.C.A. § 11-14-108 in no way relieves the person performing the test from responsibility for acts of negligence in performing the tests. The Motion should be denied.

### V. IMMUNITY

A, State law

The supreme court has consistently held that section 21-9-301 provides city employees with immunity from civil liability for negligent acts but not for intentional acts. *See Deitsch v.*

*Tillery,* 309 Ark. 401, 833 S.W.2d 760(1992).  Of course, state law can provide no immunity to federal claims under the Supremacy Clause.  With respect to qualified immunity, as argued in the Brief above, the law was clearly established. *Ferguson v. City Of Charleston*, 532 U.S. 67 (2001). In *Qualls*, Qualls filed suit against public employer, for wrongfully discharging her from her job. The court rejected the district court's determination that since appellant was an at will employee, she had no cause of action for her breach of contract claim. The court stated that an exception to the employment at-will doctrine could arise from reliance on a promise made in an employment handbook. The court found that appellant relied upon a promise by appellee that employees would only be fired if they refused to take the drug test. Since appellant denied refusing or interfering with the drug test and the clinic nurse provided testimony to support this position, the court found that the testimony raised issues of fact going to the heart of the case.  Of course, Plaintiff signed the Acknowledgment, but denies the employment was at will because of *Qualls*..

### B. Qualified Immunity

Plaintiff was fired by the city of Stuttgart (herein after "the City") for refusing a drug test requested by an officer of the State Police, David Chastain.  Plaintiff's supervisor and decision-maker,Tommy Lawson, testified that Ms. Hess was terminated for no other reason.  (Ex. A Transcript of Hearing of June 1, 2010 ("Hearing") at 12:10-13; 13:5-19 and 15:23-17:14) Personnel director, Carol Ables, testified that Plaintiff would not have been fired if she had just taken the drug test as requested by a non-city employee, David Chastain. (Ex. B, Deposition of Carol Abels, ("Abels Dep."), at 9:9-19, July 9, 2012)  Ms. Hess was a good employee at the City. (Ex. C, Lawson Dep. at 5:20-24)  The City admits that Hess's refusal to take the drug test was not a violation of the City drug testing policy and that the City did not request she take a drug test. (Ex. B, Abels Dep. at 19:1-21 and Hearing at 16:19-17:14)  Further, the City admits that employees can rely on the City's drug testing policy.  (Id.; (Ex. C, Lawson Dep. at 9:19-22) and (Ex. D, Deposition of Marianne Maynard ("Maynard Dep") at 7:12-17)

The City's drug test policy relied on by Hess's supervisor, Tommy Lawson, in deciding to terminate Plaintiff altered her at-will status with regard to this policy.  Plaintiff and city employees, including Lawson, believe that city employees should be able to rely on the drug testing policy

adopted by the City. See Qualls v. Hickory Springs Manufacturing Company, 994 F. 2d 505 (1993). Further, Mayor Maynard testified that an employee should not be forced to cooperate with law enforcement if it "broke their constitutional rights." (Ex. D, Maynard Dep. at 8:23-24) Even Mr. Chastain believes that Hess had every right to refuse the drug test he requested. (Ex. E, Deposition of David Chastain ("Chastain Dep") at 24:25-25:2)

On February 23rd, 2010, State Trooper David Chastain was running surveillance on a truck owned by Donnie Freeman, a suspected drug distributor and former boyfriend of the Plaintiff, at a Wal-Mart parking lot for possible drug distribution. The Plaintiff, who had been employed with the City since February of 2008, was on duty with the City of Stuttgart and in a City of Stuttgart vehicle. While watching Mr. Freeman's truck, Trooper Chastain observed the Plaintiff opening the door to Donnie Freeman's truck. Plaintiff was at Freeman's truck to pick up some tax documents that she needed for her to complete her taxes. (Ex. F Deposition of Shawna Hess ("Hess Dep") at 9:12-15) After the Plaintiff opened the door to Mr. Freeman's truck, Trooper Chastain approached Plaintiff and asked what she was doing in Mr. Freeman's truck. Ultimately, Trooper Chastain told the Plaintiff to get in her "truck and go back to work and to be at his office later on that day." Trooper Chastain then called the Plaintiff's supervisor, Tommy Lawson, to request that he allow her to come to his office for an interview. Mr. Lawson told Plaintiff to go to Officer Chastain's office for an interview. This interview occurred sometime after lunch, approximately one o'clock pm.

Trooper Chastain sought information about Donnie Freeman. After the Plaintiff said she did not know anything about Mr. Freeman or any drug distribution and that she was not a drug user, Trooper Chastain requested that Plaintiff take a drug test: Plaintiff refused to take the drug test because the city did not request that she take the drug test. (Ex. F, Hess Dep. at 22:25-23:1-5 and 38:5-13) Hess would have allowed Chastain to give her a drug test but Mr. Lawson told her he would "honor" her own drug test. (Id. at 22:2-20)

Hess finally told Mr. Chastain that she would flunk the test so that she be allowed to leave. (Id. at 20:7-20) State Police Officer David Chastain requested that Hess drive a city vehicle after he spoke with her at the Wal-Mart parking lot and Hess's supervisor Tommy Lawson did not

believe that Hess was under the influence or using drugs. (Ex.C, Lawson Dep. at 11:11-22) In fact, Hess was not under the influence or in possession of drugs that day of her termination. (Ex. F, Hearing at 40:4-42:22) In fact, she had her own drug test performed which showed that she was clean. (Ex. F, Hess Drug Screen) She immediately provided the test to Mr. Lawson. (Ex.C, Lawson Dep. at 19:7-22)

According to the written statement provided by Trooper Chastain to Mr. Lawson and Ms. Ables, the Plaintiff arrived at the Wal-Mart and went to Mr. Freeman's truck and was opening the door. Hess was not under the influence or in possession of drugs that day of her termination. (Ex. A,Hearing at 40:4-42:22) Hess continued to work that day after meeting with Chastain. (Ex. C, Lawson Dep. at 13:14-14:4) Further, another male employee in the same city department as Hess was reported to be using drugs and under the influence but nothing was done to him. He was not asked to take a drug test and suffered no disciplinary action. (Ex. D, Lawson Dep. at 16:4-18:16).

The City never asked Ms. Hess about her conversation with Mr. Chastain. (Ex.C, Lawson Dep. at 15:13-25) Further, according to Mr. Chastain, he only told Mr. Lawson that she "refused to take the drug test that I offered her." (Ex. A, Hearing at 29:16-17) Ms. Abels attempted to change the reason for Hess's termination at the Unemployment Hearing by claiming that Hess's alleged statement violated a City drug policy because she was under the influence. However, Abels then admitted it was not the reason for the termination. (Ex. A, Hearing at 31:1-20) Further, the decision maker, Mr. Lawson, confirmed that Chastain did not tell him that Hess was under the influence and Lawson allowed Hess to drive a city vehicle and work the rest of the day. (Id. at 33:4-18 and Ex. C, Lawson Dep. at 13:14-14:4).

For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "It is important to emphasize that this inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (quoting Saucier, 533 U.S. at 201, 121 S.Ct. 2151). "The general

proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." *Ashcroft v. al-Kidd*, ––– U.S. ––––, 131 S.Ct. 2074, 2084, 179 L.Ed.2d 1149 (2011) (citing Saucier, 533 U.S. at 201–02, 121 S.Ct. 2151).   Thus, "[t]he relevant, dispositive inquiry . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."   Saucier, 533 U.S. at 202, 121 S.Ct. 2151 (citing *Wilson v. Layne*, 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)).

*Uniformed Sanitation Men Ass'n, Inc., v. Commissioner of Sanitation of the City of New York*, 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968) is the clearly established law that controls this case.   There, the New York Commissioner of Investigation looked into allegations that employees of the Department of Sanitation were charging improper fees to use certain city facilities and pocketing the proceeds.   The petitioners were 15 sanitation employees who were summoned before the Commissioner, and each was advised that pursuant to § 1123 of the New York City Charter,[4] "if he refused to testify with respect to his official conduct or that of any other city employee on the grounds of self-incrimination, his employment and eligibility for other city employment would terminate."   392 U.S. at 282, 88 S.Ct. 1917.   Twelve of the petitioners nonetheless asserted their constitutional privilege against self-incrimination and refused to testify, upon which they were dismissed "on the explicit ground . that they had refused to testify."   Id. Three of the petitioners subjected themselves to questioning and denied the charges.   They were suspended and subsequently summoned before a grand jury and asked to sign waivers of immunity, which they refused. After an administrative hearing, they were dismissed "on the sole ground that they had violated § 1123 of the City Charter by refusing to sign waivers of immunity." Id. at 282–83, 88 S.Ct. 1917.   The United States Supreme Court held that New York could not force the petitioners to choose between surrendering their constitutional rights or their jobs and concluded they had been wrongfully dismissed.   Id. at 284–85, 88 S.Ct. 1917.   Here, requiring Plaintiff to submit to an unconstitutional drug test is the same.

*Gardner v. Broderick*, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968), the companion case to Uniformed Sanitation Men, involved similar facts and came to a similar

conclusion. There, a police officer was summoned to testify before a grand jury and was asked to sign a waiver of immunity after being told he would be fired if he did not sign one. He refused, was given an administrative hearing, and was discharged solely for this refusal. Gardner, 392 U.S. at 274–75, 88 S.Ct. 1913. Though the Court acknowledged that one's privilege against self-incrimination can be knowingly and voluntarily waived, it concluded that "the mandate of the great privilege against self-incrimination does not tolerate the attempt, regardless of its ultimate effectiveness, to coerce a waiver of the immunity it confers on penalty of the loss of employment." Id. at 279, 88 S.Ct. 1913.

*Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967), a counterpart to the aforementioned Supreme Court cases, involved police officers under investigation who were informed they could claim their privilege against self-incrimination but that refusal to answer a question would subject them to termination. The appellant officers did not claim the privilege and answered the questions, which answers then led to their criminal prosecutions and convictions. The Garrity Court held that the officers' statements were products of coercion obtained in violation of due process:

> The choice given petitioners was either to forfeit their jobs or to incriminate themselves. The option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or remain silent. That practice . is likely to exert such pressure on an individual as to disable him from making a free and rational choice. We think the statements were infected by the coercion inherent in this scheme of questioning and cannot be sustained as voluntary under our prior decisions.

385 U.S. at 497–98, 87 S.Ct. 616 (citation and internal quotation marks omitted).

Though Uniformed Sanitation Men and its ilk involved the Fifth Amendment rather than the Fourth, the cases stand for the broader proposition that public employees cannot be given a stark choice between asserting a constitutional right and keeping their jobs. See Uniformed Sanitation Men, 392 U.S. at 284, 88 S.Ct. 1917 (finding that the offensive aspect of the proceedings against petitioners was that they "present[ed] them with a choice between surrendering their constitutional rights or their jobs"). As Garrity explained, the presentment of such a choice is coercive.[5] 385 U.S. at 497–98, 87 S.Ct. 616. The 8th Circuit cases on this issue fall well within the clearly established law, upholding employer actions where the employees were not required to give up

constitutional protections in order to keep their employment. In Lesher v. Reed, 12 F.3d 148 (8th Cir.1994), which neither is controlling nor would clearly establish the law even were it from this Circuit because it falls squarely within Uniformed Sanitation Men. There, a police officer who had a possessory interest in a dog refused to give the dog to the police department until threatened that he would be relieved of duty if he did not do so. The Eighth Circuit found that this was a seizure within the meaning of the Fourth Amendment. Though the court remanded for a determination on whether the warrantless seizure was justified by an exception, it noted, citing to Uniformed Sanitation Men, that "the State may not coerce [public employees] into relinquishing a constitutional guarantee under threat of losing their employment." Lesher, 12 F.3d at 150. Qualified immunity should be denied.

### VI. SAME DECISION

Same decision is an affirmative defense. *McClurg v. Santa Rosa Golf & Beach Club, Inc.*, 46 F. Supp. 2d 1244 (N.D. Fla. 1999). After-acquired evidence each is an affirmative defense. *Red Deer v. Cherokee County*, 183 F.R.D. 642 (N.D. Iowa 1999). Neither was not plead and therefore waived under Rule 8. , Sayre v. Musicland Group, Inc., Subsidiary of American Can Co., 850 F.2d 350 (8th Cir. Minn. 1988). Further, after-acquired evidence is inconsistent with the ADA. Schmidt v. Safeway Inc., 864 F.Supp. 991, 994-95 (D.Or. 1994) (holding that evidence acquired during the discovery process that employee had failed to disclose on his employment application a conviction that occurred 40 years prior did not bar plaintiff from all relief under the ADA, although it could limit damages). Alternatively, allow a male to continue working creates a material issue of fact on this affirmative defense.

WHEREFORE Plaintiff prays for an Order denying Defendant's Motion for Summary Judgment, and for all other proper relief.

Respectfully submitted,

Paul Pfeifer

and

SUTTER & GILLHAM, PLLC
Attorneys at Law
310 West Conway St.
P. O. Box 2012
Benton, AR  72018
501/315-1910

By: */s/ Luther Oneal Sutter*
Luther Oneal Sutter, Ark. Bar No. 95031
luthersutter@yahoo.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of August, 2012, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to counsel for the Defendant:

John Wilkerson'

*/s/Luther Oneal Sutter*
Luther Oneal Sutter